GRITT, JUDGE:
Claimants, Larry D. Whitehair, Sharon Whitehair, D ale Whitehair, and Amy Whitehair, brought this action for One Million Dollars against the respondent for personal injuries sustained as a result of an automobile accident that occurred on *203 November 10,1987, on the northbound Little Sandy Bridge while they were traveling north on 1-79 in Kanawha County. The hearing of this matter was held September 19 through 21,2001, and April 2 and 3, 2002. Prior to the beginning of the hearing of the claim, the Court visited the scene of the incident. The Court is of the opinion to deny this claim for the reasons set forth more fully below.
The incident at issue in this claim occurred on the northbound Little Sandy Bridge, which bridge is located on 1-79 near Elkview approximately ten miles north of Charleston in Kanawha County. The Little Sandy Bridge consists of two bridges that cross over Little Sandy Road and Creek. One bridge carries northbound traffic on 1-79, while the other bridge carries southbound traffic. A gap of several feet divides the bridges from one another. Each bridge has a concrete deck and is over one thousand feet long. Each bridge has two traffic lanes and the bridges are supported by pillars. Both bridges contain 32-inch high concrete barriers or parapet walls that run along the sides of each bridge. The bridges are curved, with the traffic facing a curve to the left on the northbound bridge. There is a steadily increasing height between the bridges and the ground below the bridges from both ends of each bridge to the center. Guardrail is located at both the northern and southern ends of each bridge. There were striped objectmarkers in place at each end of each bridge.[1] These markers had been placed at these locations to warn the traveling public that they were entering a bridge. It is not certain whether or not that there was a “Bridge Freezes Before Roadway” sign in place for northbound traffic to observe at the time of this incident. There are grassy median strips that extend both north and south from both ends of the Little Sandy Bridges. The southern grassy median strip extends for 2.4 miles south of the bridges where it ends at a concrete median strip.
The incident giving rise to this claim occurred on November 10, 1987. The Whitehair family went to the Charleston Town Center Mall to do some early Christmas shopping and to have dinner. They left the mall at closing time which was approximately 9:00 p.m. Larry Whitehair, husband of Sharon Whitehair and father of claimants Amy and Dale Whitehair, was driving his 1985 BuickLeSabre. Claimant Sharon Whitehair was in the front passenger seat while Dale Whitehair was in the back seat behind his father and Amy Whitehair was in the back seat behind her mother. When the claimants left Charleston Town CenterMall, there was some form of precipitation falling. The testimony regarding exactly what form of precipitation was actually falling is not entirely clear, but the majority of witnesses testified that it was raining lightly. Each of the claimants testified that Larry Whitehair did not have any trouble operating his vehicle between Charleston and the Little Sandy Bridges. There is nothing in the record that 1-79 presented a hazard to the claimants until they reached the northbound Little Sandy Bridge. However, the closer the claimants got to their home in Elkview, the more the weather deteriorated. Sharon Whitehair testified that their vehicle was either on or very near the entrance to the northbound Little Sandy Bridge when she noticed that there were vehicles ahead of their vehicle on the bridge which appeared to be sliding. The claimants testified that there were *204 two or three vehicles spinning out of control on the bridge ahead of their vehicle. All of the vehicles spinning out of control were in the right lane. Larry Whitehair was able to maneuver his vehicle around the first one or two vehicles. However, either the second or third vehicle slid or otherwise drifted from the right lane into the left lane directly into the path of the claimants' vehicle, and according to the testimony of claimant Larry Whitehair, that vehicle “clipped” claimants’ vehicle. The claimants' vehicle continued to slide and came to rest at an angle against the concrete parapet wall on the left side of the northbound passing lane of the bridge. The rear of their vehicle was protruding into the passing lane. The resting-place of the claimants' vehicle was close to the northern end of the bridge. The Whitehair family suffered injuries as a result of the impact with the parapet wall. Larry Whitehair stated that he struck the steering wheel with sufficient force to break it. Sharon Whitehair testified that she struck the dashboard injuring her head, shoulder, and biting into her tongue. Dale Whitehair testified that he hit the back of the front seat hard enough to break it. Amy Whitehair also struck the back of the front seat causing her to have a bloody nose.
After coming to a complete stop, Dale Whitehair testified that he recalls his parents asking if everyone was all right. Larry Whitehair tried to restart his vehicle a few times but it was too badly damaged to start. The testimony is unclear as to which parent made the statement, but one of them stated that they could not stay in the car. Regardless, the entire family immediately exited the vehicle. Amy Whitehair exited the vehicle through the right rear door. At approximately the same time, Sharon Whitehair was exiting the vehicle through the right front door. Larry Whitehair could not exit through the driver side door because it was jammed against the parapet wall. Therefore, he had to crawl over to the right front door to exit the vehicle. Dale Whitehair was the last person to exit the vehicle because his feet got tangled up with Amy Whitehair’s purse straps when he was tossed around in the back seat during the accident. Once he got his feet free from the purse straps, he was able to exit the vehicle through the left rear door. Each claimant testified that he or she left the vehicle out of fear that another car was going to slam into their vehicle on the icy bridge. They all stated that their intentions as a group were to reach an area of safety. The claimants, except for Amy Whitehair, testified that the bridge surface was very slick and that they had a difficult time standing up without holding on to something. According to the claimants, almost as soon as they exited the vehicle they observed another vehicle coming directly towards them. They testified that they were trying to climb over the parapet wall into the what they believed to be the southbound lanes of 1-79 to place the wall between themselves and other northbound vehicles. Each claimant testified that he or she believed that each was simply stepping into the southbound lane.[2] Tragically, this was not another lane but the bridge parapet wall *205 on the other side of which was a sheer drop to the ground below. Three of the four claimants testified that they believed they were not on a bridge at the time of the accident. Each of the claimants fell approximately 80 feet to the ground. Miraculously, they all survived this treacherous fall, but each family member suffered serious injuries.
Claimants contend respondent knew or should have known that the northbound Little Sandy Bridge presented an icy, hazardous condition to the traveling public; that respondent had a number of pre-treatment options which could have prevented or alleviated such icing conditions on the bridge, but failed to utilize any of these options; and that respondent failed to provide proper warning to the traveling public of a known hazardous condition. It is claimants’ contention that respondent’s failure to respond properly to this hazard constituted negligence and that this negligence was the proximate cause of the claimants’ injuries sustained in their fall from the bridge.
Respondent asserts that it did not have adequate notice that there was ice forming on the northbound Little Sandy Bridge nor did it have a reasonable amount of time to apply remedial materials. Respondent also asserts that pretreatment options were not the proper standard to apply under these circumstances and pretreatment options would have been ineffective to prevent icing on the northbound Little Sandy Bridge. . Further, respondent asserts that flashing warning signs and /or ice sensor devices would not have been helpful in this claim.
Patrick Rodgers, the operator of a 1985 Subaru hatchback, arrived on the scene after the claimants’ vehicle came to rest. He stated that he had driven over the Little Sandy Bridges a few times prior to this incident. Mr. Rodgers had three passengers in his vehicle. Jeffrey M. Miller was the front seat passenger while Kristina D. Cyrus and Sally A. Jenkins were seated in the rear. Kristina Cyrus has since married and now uses her married name, Kristina Skross, by which she will be identified throughout this opinion. Mr. Rodgers and his passengers were students at West Virginia Wesleyan College and on the date of this incident they had also been shopping al the Charleston Town Center Mall. They were on their way back to Buckhannon when this incident occurred. Mr. Rodgers stated that it was only misting rain when they left the mall, but the further north he drove the heavier the rain became. He stated that it was approximately a little less than ten miles prior to the bridge when the precipitation changed from rain to a mixture of rain and snow.
Mr. Rodgers testified that he did not have any problems operating his vehicle between Charleston and the northbound Little Sandy Bridge. This was corroborated by Kristina Skross who also stated that Mr. Rodgers had no trouble operating the vehicle until he arrived at the bridge. She further testified that in her opinion he was driving safely under the circumstances then and there existing. Mrs. Skross stated that she knew that they were on a bridge when this incident occurred. Both Mr. Rodgers and Mrs. Skross indicated that it was not until he was very close to the bridge that he started slowing down due to poor road conditions. At this point, he stated that it was very dark outside and visibility was poor. His vehicle was in the passing lane as he drove onto the northbound Little Sandy Bridge. As soon as he drove onto the bridge he immediately knew that it was covered with ice. The only vehicle that he observed on the bridge at that moment was the claimants’ vehicle which was resting against the left side of the bridge at the point on the bridge where the northbound lanes turn to the left. Claimants’ vehicle was resting against the wall near the north end of the bridge. *206 Upon observing the claimants' vehicle, Patrick Rodgers proceeded to try to drive into the right lane when his vehicle spun around on the ice and did at least one 360-degree turn. Mr. Rodgers initially brought his vehicle to rest with the rear of his vehicle facing the right side of the claimants’ vehicle. He testified that his vehicle initially stopped approximately one or two feet away from the claimants' vehicle. According to Mr. Rodgers and Mrs. Skross, there was no collision between the Rodgers’ vehicle and the claimants’ vehicle. As soon as he brought his vehicle to a stop, he looked back and saw a Buick traveling directly towards his vehicle. The Buick, driven by Ramona Gunnoe, slammed into the right front of Mr. Rodgers’ vehicle. The impact of this collision spun his vehicle around such that the left front portion of his car came to rest against the right front fender of the Whitehair vehicle. Ms. Gunnoe’s vehicle came to rest in the grassy median approximately thirty-five yards north of the location of the initial impact. Mr. Rodgers’ stated that all of the damage to his Subaru was caused by Ms. Gunnoe’s vehicle. After the impact from Ms. Gunnoe’s vehicle, the three passengers in Mr. Rodgers’ vehicle got out of the vehicle and stepped onto the bridge while Mr. Rodgers stayed in the vehicle to try to contact the State police. Mr. Rodgers saw the first police car arrive on the scene. The police officer was traveling northbound on 1-79, and when he reached the bridge, his vehicle slid out of control and almost struck the Rodgers’ vehicle. Once Mr. Rodgers was finally able to get out of his vehicle, he noticed that the bridge was a “solid sheet of ice.” He described it as being half an inch thick. Patrick Rodgers remembers looking up and seeing his passengers walk north along the concrete wall to the grassy median area off the bridge on the left side of 1-79. According to Mr. Rodgers, the distance from the accident scene to the end of the bridge appeared to be around 35 to 50 yards. Mr. Rodgers testified that he did not see the claimants during this entire sequence of events, including up to and after his vehicle was struck by the Gunnoe vehicle.
Mrs. Skross testified that she and Sally Jenkins exited Patrick Rodgers’ vehicle approximately one or two minutes after the collision. Once out of the vehicle, she and Sally Jenkins began walking towards the end of the bridge along the left side of the bridge next to the parapet wall when she saw three people sitting on the wall. She stated that one person appeared to be standing right behind them. According to her observations, it appeared that there were two children and their mother sitting on the wall and the father was standing behind them. Suddenly, she observed the four people jump off the bridge. The three people sitting on the wall jumped first. The woman was the last one sitting on the wall to jump followed by the father, who was the last one to jump. Mrs. Skross testified that she does not believe that anyone else saw them jump. She recalls looking over the side of the bridge where they had jumped to determine whether or not she should jump. However, Ms. Jenkins warned her that she could not see the ground or what was below and that she should not jump. Mrs. Skross also stated that she could see across to the southbound bridge as well as observing steam rising up from underneath the southbound bridge. Once she decided hot to jump, Mrs. Skross and Ms. Jenkins ran to the end of the northbound bridge and stopped on the leftside of the interstate in the grassy median. Mrs. Skross estimated that it took a matter of seconds to reach the end of the bridge from the location where she saw the claimants jump. She also added that it was not slippery at the location on the bridge where they ran off of it. Mrs. Skross made a sworn statement to the investigating officer, State Trooper K.T. Quinlan, on the night of this incident, which statement was corroborated by her testimony regarding her *207 observations of the claimants jumping off the northbound Little Sandy Bridge. Also in this statement, she identified the wrecked vehicle as a white Buick and stated that she saw people getting out of the Buick while the vehicle she was in was still spinning.
The first police officers arrived at the scene of the accident at approximately 9:36 p.m. Deputy Jesse Johnson of the Kanawha County Sheriffs Office participated in the investigation of the accident. Approximately fifteen to twenty minutes prior to the accident, Deputy Johnson had driven across the southbound Little Sandy Bridge. He was traveling from the Elkview detachment to Charleston. He testified that the roadway had been damp all evening, but he stated that there had not been any ice on the roads. He also testified that when he drove over the southbound Little Sandy Bridge prior to the accident, the conditions on the bridge were cool and damp and he had no problem traveling across the bridge at that time. Deputy Johnson got to the scene of the accident at the same time as Officer K. T. Quinlan of the West Virginia State Police. By the time Deputy Johnson and Officer Quinlan arrived at the scene of the incident at approximately 9:36 p.m., the conditions on the northbound Little Sandy Bridge had seriously deteriorated. Both officers stated thatthere was black ice on the bridge.
Lewis Adkins, a former employee with respondent, was a truck driver for respondent at the time of this incident. He has since retired. One of Mr. Adkins’ responsibilities while employed with the respondent was to drive a salt truck to treat roads during the winter when needed. During the winter of 1987 and 1988, Mr. Adkins was responsible for treating 1-79 from the Westmoreland Exit in Charleston to the Elkview Exit in Elkview. This area includes the Little Sandy Bridges. He had been responsible for treating this portion of highway for six or seven years prior to this incident. He was familiar with the Little Sandy Bridges. Although Mr. Adkins was somewhat confused about the hours that he worked that evening, first explaining that he was on the midnight shift after the claimants’ accident, the work logs from respondent established that he actually was working the evening shift, and thus his testimony was relevant for the time period in question herein. He testified that during his first trip across the northbound Little Sandy Bridge that night he noticed that the front tires on his truck slid a little on the bridge when he was applying salt to it. According to Mr. Adkins, he did not apply very much salt on the bridge on his first trip across it. Mr. Adkins testified that he informed his supervisor that it was not enough salt and that he needed to put more down based upon how slick this bridge was. Mr. Adkins testified that he was told not to place a heavy layer of salt on the bridge by his supervisor. Mr. Adkins’ supervisor is deceased and was not available to testify. After leaving the bridge, Mr. Adkins traveled north to finish treating 1-79 up to the Elkview exit. It was approximately twenty or thirty minutes after he left the northbound Little Sandy Bridge that he heard about the incident herein. Mr. Adkins then proceeded southbound to the Little Sandy Bridges where he observed the emergency vehicles and personnel on both of the 1-79 bridges. Oncé he observed the accidents that had occurred, Mr. Adkins wentback to the respondent’s garage where he got a larger load of salt. He drove back to the northbound Little Sandy Bridge and placed a thicker layer of salt on this bridge as well as the other bridges on his route.
Hugh McLean, a highway engineer currently employed with a private engineering firm, testified as claimant’s expert witness. Mr. McLean visited the Little Sandy Bridges, took measurements, reviewed several depositions in this claim, and *208 reviewed construction drawings and records of the Little Sandy Bridges in forming his expert opinions. It is based upon this information and his knowledge in the field of highway engineering that he is of the opinion that the icy conditions on the northbound Little Sandy Bridge were the cause of the automobile accidents which occurred. Further, these icy conditions could have been prevented by the respondent and the failure to do so constitutes negligence on respondent’s part. Mr. McLean testified as to how icy conditions lead to the lack of a friction coefficient which can cause accidents. A friction coefficient is the friction that develops between two surfaces. In this particular claim, it is the friction between vehicular tires and the bridge deck. The friction coefficient allows the car to move, steer, and turn. If there is not an adequate friction coefficient, then the tires are not going to maintain their grip on the road and the vehicle will not respond as the driver directs. Therefore, ice can severely degrádate the friction coefficient. He concluded that based upon numerous eye-witnesses testimony, including Officer Quinlan and Deputy Johnson, the northbound Little Sandy Bridge did have ice on it the night of this incident.
Mr. McLean is of the professional opinion that a system of flashing lights would have been helpful, especially to augment static warning signs which drivers tend to ignore añera period of time. Mr. McLean stated that the flashing lights would increase the drivers’ attention to the fact that there was a hazard ahead. The second warning device that he asserts could have been used is a detection device attached to the bridge or installed in it that warns the respondent that conditions are conducive for icing to develop. Furthermore, Mr. McLean indicated that these various warning systems have been available as far back as the early 1960's and that they have been reasonably reliable. Mr. McLean is also of the opinion that the northbound Little Sandy Bridge should have been pre-treated to provide more protection for the traveling public. He described pre-treating as applying a de-icing solution or agent on the bridge surface in advance of a storm or in anticipation of an icing event. According to Mr. McLean, the de-icing treatment will remain effective, depending upon the amount of traffic and the solution used, from a few days up to two weeks. Mr. McLean testified that this de-icing treatment has been available and used successfully since the early 1970's. It is his expert opinion these measures, if taken on the northbound Little Sandy Bridge, may have prevented the claimants’ accident.
Charles Raymond Lewis, II, Planning and Research Engineer of the Traffic Engineering Division for respondent testified as an expert witness on behalf of respondent. His general responsibilities with respondent include processing accident studies and traffic safety studies. He serves in the highway safety improvement program and also works in training. He testified that the Division of Traffic Engineering works in five areas including planning, design, construction, maintenance, and operation of the highways. Mr. Lewis is familiar with the Little Sandy Bridges. He has driven over them and stopped to look at the bridges in his job capacity a total of at least a dozen times. In conducting his investigation for this claim, he visited the site three times, reviewed records, interpreted plans, and compiled information regarding the bridges. In preparation for testifying, he also reviewed the report of the claimants’ expert witness, as well as the depositions and prior testimony. After reviewing all of this information, Mr. Lewis concluded that respondent had not failed adequately to maintain the northbound Little Sandy Bridge and was not negligent in this claim for the following reasons. Mr. Lewis testified that the standard procedures for icy bridge conditions such as this are for respondent to *209 patrol the bridge periodically when it appears necessary, to have a salt truck on standby so as to spot treat, and to rely on law-enforcement to report any deteriorating conditions. The salt trucks are equipped with spreader boxes as well as salt and abrasives to spot treat the needed areas. Mr. Lewis testified that regardless of whether or not there was a “Bridge Freezes Before Roadway Sign” present at the time of the claimants’ incident, it would probably not have made any difference in the outcome. Such a static warning sign is effective for non-local drivers who would tend to pay more attention to the sign due to a lack of familiarity with the highway. However, local drivers who drive the same section of road will already be aware of the condition and will tend not to rely upon signage for the highway. The local driver may not even notice the existence of the signs after passing the signs so often. Given the fact that both Larry and Sharon Whitehair had driven across the Little Sandy Bridges on a daily basis for several years, Mr. Lewis concluded that if there had been a sign present it would not have made a difference.
Mr. Lewis also addressed the issue of pre-treatment, which he described as anticipating a storm and then treating the road surface ahead of the storm usually with either sodium chloride or calcium chloride. It is his opinion that pre-treatment is not a viable option especially on an interstate where there is a heavier volume of traffic that would remove the substance. Furthermore, these pre-treatment substances are water soluble and even a moderate amount of rain would have washed the materials off the road surface quickly. Mr. Lewis testified that given the rain immediately prior to the accident, pre-treating the northbound Little Sandy Bridge would not have been helpful.
The next issue Mr. Lewis addressed was whether or not an ice detection or sensor device would have been helpful in preventing this incident. According to Mr. Lewis, ice detectors or sensors were available in 1987 and there were two such devices installed by respondent prior to 1987. There was one such device at the St. Albans/Nitro Bridge on 1-64 and one on the FortHill Bridge. He testified that neither one of these devices was reliable. The sensors would either not detect the icy conditions and expose drivers to a high risk in that the driver would rely on the sensors to their own detriment or the sensors would give a false alarm and detect icy conditions when such a condition did not exist. Finally, Mr. Lewis also disagreed with the claimants’ expert that respondent should have had in place a sensor device in conjunction with flashing warning lights. Again, he testified that such a device was unreliable based upon the same opinion given above, and since the sensors were unreliable, these devices should not have been used. Mr. Lewis concluded that in his opinion respondent took all maintenance precautions that it could possibly do on the night of this incident which was to rely on law enforcement and to spot treat the northbound Little Sandy Bridge.
It is a well established principle of law that the State of West Virginia is neither an insurer nor a guarantor of the safety of motorists on its roads and highways. Adkins v. Sims, 46 S.E.2d 811 (W.Va.1947). To hold respondent liable, the claimant must establish by a preponderance of the evidence that respondent had actual or constructive notice of the road defect in question and a reasonable amount of time to take corrective action. Chapman v. Dept. of Highways 16 Ct. Cl. 103 (1986); Pritt v. Dept. of Highways, 16 Ct. Cl.8 (1985). Respondent cannot be expected or required to keep its highways absolutely free of ice and snow at all times, and the presence of an isolated patch on a highway during winter months is normally insufficient to *210 charge respondent with negligence. McDonald v. Dept. of Highways, 13 Ct. Cl. (1979). However, the respondent does owe a duty to travelers to exercise reasonable care and diligence in the maintenance of highways. Lewis v. Dept. of Highways, Ct. Cl. 136 (1986).
In the instant claim, the Court is of the opinion that respondent acted reasonably under the circumstances then and there existing. Respondent did not have adequate notice of the icy conditions on the northbound Little Sandy Bridge, and it did not have a reasonable amount of time to take corrective actions. Flashing warning signs would not have been effective in this claim such that the placement of such signs in all probability would not have prevented the accidents which occurred on the northbound Little Sandy Bridge that night. The sensor and detection type devices available to respondent at that time were not proven to be reliable. In addition, the pre-treatment options recommended by claimants’ expert would not have been helpful in this claim because the traffic and rain would have removed it before such substances would have been effective. According to respondent’s expert, respondent met the appropriate standard of care which was to spot treat icy areas on the roads and bridges. Mr. Adkins testified that he had just salted the northbound Little Sandy Bridge approximately fifteen minutes prior to this incident. Although Mr. Adkins may have wanted to apply more salt at the time, there was no evidence presented that the application of more salt would have or could have prevented this incident particularly in light the testimony of Mr. Lewis, respondent’s expert witness. While the Court is sympathetic to what happened to the Whitehair family and what each of them has been through since this accident, the Court is of the opinion that the respondent acted diligently in its maintenance of the northbound Little Sandy Bridge on the date of this incident and was not negligent. Inasmuch as the Court finds no negligence on the part of the respondent, it is not necessary to consider the claimants’ negligence that contributed to their injuries. However, the testimony of the claimants that they did not know they were on a bridge, especially in light of the claimants’ familiarity with the bridge and the testimony of the other witnesses, lead to the conclusion that the claimants knew or should have known they were on a bridge at the time they decided to cross the parapet wall on the northbound Little Sandy Bridge. Further, since the Court has determined that the respondent was not negligent in the maintenance of the bridge, it is not necessary to consider the claimants’ argument with regard to the doctrine of sudden emergency.
In accordance with the findings of fact and conclusions of law as stated herein above, the Court is of the opinion to and does deny this claim.
Claim disallowed.

 ‘Charles Raymond Lewis, II, the Planning and Research Engineer with respondent's Traffic Engineering Division, testified there were striped object markers in place at each end of each bridge since 1985.

 Although the statements herein reflect the testimony from each of the claimants at the hearing of this claim, the Court notes that interrogatories sworn to by claimants Sharon 'Whitehair, Dale Whitehair, and Amy Whitehair filed in an action then pending in the Kanawha County Circuit Court against Larry Whitehair stated as follows: “...the Defendant [Larry Whitehair] negligently advised and encouraged the Plaintiffs to jump over the bridge to avoid oncoming traffic.”